[No. 2883.]

Herman Weller *v.* The State.

1. Construction of Statutes—Statutory Repeal—Jurisdiction—Case Stated.—By the act of January 22, 1875, Crockett county was created out of a portion of Bexar county. By the act of February 10, 1875, it was attached to Kinney county for judicial purposes. No further legislation was had concerning Crockett county until the adoption of the Revised Statutes, when it was embraced in the twentieth judicial district, but was not attached to any county for judicial purposes. By the act of April 28, 1882, it was again attached to Kinney county for judicial purposes, and again so attached by the act of April 9, 1883. It appears never to have been attached, for judicial purposes, to any county other than Kinney, and never to have been organized. Section 3 of the final title of the Revised Statutes provides as follows: "All civil statutes of a general nature, in force when the Revised Statutes take effect, and which are not included herein, or which are not hereby expressly continued in force, are hereby repealed." *Held,* that the effect of the section quoted was to repeal the act of February 10, 1875, which was a statute of a general nature. *Held,* further, that in divesting Kinney county of jurisdiction over Crockett county, the effect of the repealing statute was to restore the jurisdiction of Bexar county, where it remained until the passage of the act of April 28, 1882, when it was again conferred upon Kinney.

2. Same.—Indictment was presented in the district court of Kinney county September 19, 1882, when Kinney county had jurisdiction over Crockett county, but it charged that the offense was committed in Crockett county on March 30, 1882, at which time Crockett county was under the jurisdiction of Bexar county. It does not appear, however, that Bexar county ever exercised or attempted to exercise jurisdiction over the case. Under the well settled rule that when the place where an offense is committed

is, after the commission of the offense, created into a new county, such new county has jurisdiction over the offense, it is *held* that Crockett county, having been attached to Kinney county for judicial purposes, the indictment, laying the venue of the offense in the unorganized county of Crockett, was properly presented in Kinney county, which county had jurisdiction to try and determine the case. See the opinion *in extenso* on the question, and note the opinion also for exceptions to the indictment properly overruled.

3. EVIDENCE—CONFESSIONS.—It is a common law rule that the confession of a defendant, induced by promises or threats that might have influenced his mind, is not admissible in evidence against him, under any circumstances. To this rule, however, we have a statutory exception, which qualifies such confession as evidence if, in connection with it, the accused makes a statement of facts or circumstances which are found to be true, and which conduce to establish his guilt of the offense charged. In this case the accused, without being warned, and in view of promises of the arresting officers of protection from mob violence, and of assistance to effect his escape, confessed that he killed the deceased, that his motive was robbery, that he killed him with a pistol and rocks, at a certain place, and dragged his body to a certain bluff and threw it in the Rio Grande, and that he secreted the money in a certain crevice. He pointed out the place of the murder where two bloody rocks were found, and whence a heavy body had evidently been dragged to a bluff overlooking the river, and also a crevice in which the money was found. *Held*, that the extraneous statements of the accused having been found to be true, his confession comes properly within the exception to the general rule, and was properly admitted. See the opinion *in extenso* on the question.

4 SAME.—The decision in Walker's case (2 Texas Ct. App., 326), correctly states the rule of construction of the statute regulating the admission of confessions, as follows: "In this State, when a prisoner makes a statement of facts, and in consequence of such information the property stolen, the bloody clothes of the deceased, or the instrument with which he says the offense was committed, or any other material fact, is discovered, such statement, together with the confession of the crime itself, is proper testimony to go before the jury."

5. SAME—CASES OVERRULED.—Insofar as they hold that only such statements as are afterwards found to be true are admissible, excluding the remaining parts of the confession, the following cases are hereby overruled: *Davis* v. *The State*, 8 Texas Court of Appeals, 510; *Walker* v. *The State*, 9 Texas Court of Appeals, 38; *Massey* v. *The State*, 10 Texas Court of Appeals, 645; *Kennon* v. *The State*, 11 Texas Court of Appeals, 356.

APPEAL from the District Court of Kinney. Tried below before the Hon. T. M. Paschal.

The indictment in this case, presented in the district court of Kinney county, Texas, on the nineteenth day of September,

1882, charged the appellant with the murder of one Alexander Backus, in Crockett county, an unorganized county attached to said Kinney county for judicial purposes, on the thirtieth day of March, 1882, by shooting him with a pistol. The trial of the appellant resulted in his conviction of murder in the first degree, and his punishment was fixed at a life term in the penitentiary.

C. Soap was the first witness sworn for the State. He testified that he knew Alexander Backus in his lifetime. On or about the last day of March, 1882, the witness saw the dead body of the said Backus, in Crockett county, Texas. On the morning of that day the witness was working on the Mexican side of the Rio Grande. About nine or ten o'clock on that morning he noticed what he took to be the body of a man hanging over the bluff of the river on the Texas side. Witness observed this object hanging over the bluff pretty much the entire day, and in the evening he saw a number of persons, who had congregated on the bank, draw it up. At that time the witness did not know whose body it was. Shortly after this the witness crossed to the Texas side and saw the body of Alexander Backus lying on the bluff over which witness had that day seen the object described hanging. Witness did not touch the body, but walked around it and saw that two pistol shots had been fired into the head, one entering at the back and one at the side.

The witness identified the defendant on the trial as Herman Weller. The witness saw the defendant on the day preceding the day he saw the body suspended over the bluff. The defendant was then walking around under and over the bluffs, and evidently examining them. Witness, who at that time was on the Texas side of the river, asked him what he was doing. He replied that he was just looking around. The witness again saw the defendant walking around under the bluff on the day after the deceased was killed. The body of Backus, after it was raised from the bluff, was taken on some boards and stretched on two beer barrels at a neighboring saloon. The defendant, who was then present, walked up near to the body, examined it, and said: "I don't know who it is." Some one of the campers present identified the body as that of Alexander Backus, and defendant, walking to the outside crowd, remarked: "Yes, that is Alex. What will be done about it?"

Cross-examined, the witness stated that the place where the body was found was near the camp of a party of railroad men engaged in the construction of the Sunset railroad. The camp

was composed of a large number of men. Wagons and teams were constantly passing over the wagon roads between the camp and the works. Other men were under the bluffs when the witness saw the defendant there, including witness and two or three others, who were fishing. The defendant had as much right at that place at that time as any of the party. The Rio Grande, at the bluff where the body was found hanging, was about three hundred feet wide. When he discovered the body, the witness was at work, chopping wood, on the Mexican side, about one hundred yards from the river. Witness took the object hanging over the bluff to be the body of a man when he first discovered it, and when he crossed back to the Texas side that evening, he found it to be the dead body of Alexander Backus.

M. C. Slater was the next witness sworn for the State. He testified that he knew Alexander Backus in his life time. Backus was killed in Crockett county, Texas, on the thirtieth day of March, 1882. About dark, on the night of that day, the defendant and the deceased entered the saloon kept by the witness at the railroad camp. The defendant invited Backus to take a drink. Backus refused, with the remark: "You know that I never drink, and what is the use of your asking me?" The defendant then took a drink of whisky alone, and he and the deceased left the saloon together. Within the next half hour the witness heard two reports of a pistol from the direction in which defendant and deceased had gone. The reports sounded like the shots were fired from a small pistol, and, as near as the witness could locate them by sound, they proceeded from a point near where the witness, on the next day, found the dead body of the deceased. About two hours later, the defendant returned to the witness's saloon, alone, pretending to be very drunk. Witness did not know whether or not he was actually drunk, but he did not appear so to witness. He had only taken one drink at witness's saloon. The witness knew that the defendant had a small pistol, of about thirty-six or thirty-eight calibre. The defendant had that pistol out on witness's counter that day, trying to fit cartridges to it. It then contained but three loads.

On the evening of March 31, the evening succeeding the events narrated, the witness and Charles McDonald went to the bluff, within less than a half a mile of the witness's saloon, and found the body of a man hanging over it. McDonald and others held

the witness while he reached down, caught the body and hauled it up on the bluff. Examination disclosed that the body was that of Alexander Backus, and that two shots from a small pistol of about thirty-eight calibre had penetrated the head. One ball entered the back of the head, powder burning it. The other entered at the side of the head. The face was much disfigured, and so covered with blood that the body was not at first recognized by any of the party present. The body was then taken to the witness's saloon on the lid of a coffin prepared to receive it, and was stretched on two beer barrels. The defendant came up to the body, and was asked, either by witness or McDonald, if he knew whose body it was. He replied that he did not. Shortly afterward, a young man came up from Mahoney's camp and said: "I know the body. It is that of Alexander Backus," and, pointing to the defendant, "there is a man who ought to know him, for he has been bunking with him for six months." The defendant's face turned instantly deathly pale, and he trembled to such an extent that he could not speak for a minute or two. When he recovered sufficiently, he said, with much agitation, that the face was so bloody he could not recognize the body. The body was buried that evening, and the witness saw no more of the defendant until next morning, when he came to witness's saloon with a bundle in his hand, and said that he was going away. He hung around witness's saloon for a short time, left his bundle there, and went over to another saloon near by.

On this last visit of the defendant to the witness's saloon, the witness noticed that one of his fingers, at its intersection with the nail, had been bitten nearly through. The print of two teeth on both sides were plainly discernable. The defendant first told the witness that, while at work drilling, he placed his finger on top of the drill and another man struck and mashed it with a hammer. Thirty minutes later, he told witness that a rock fell on his finger and mashed it while he was climbing a bluff. Later in the evening, he told the witness his finger was hurt by a scraper turning over and mashing it against a chain. On the next day, he told the witness that, on the night he was so drunk at witness's saloon, he fell down a bluff and mashed his finger on some rocks. When the defendant came to witness's saloon with the bundle, witness noticed that his, defendant's, pants and his clothing on one side were very bloody. The defendant was arrested by Mr. A. M. Gildea, deputy sheriff of Tom Green county.

The witness assisted Mr. Gildea as a guard after the arrest of defendant, and during the time that he had the defendant in custody he had a conversation with him, defendant. Gildea was present during a part of this conversation. The defendant, after his arrest, was held in the witness's saloon. Part of the time Gildea and witness were both with the defendant, and at other times only one or the other. A number of armed men congregated around the saloon after dark. Gildea and witness promised the defendant that they would protect him from mob violence if it should be attempted. Gildea and witness took the defendant off into the brush and prickly pear as soon as they could, and had a conversation with him. They told him that they knew that he killed Backus, and that the best thing he could do was to confess the whole thing to them, and tell them what he had done with the money, and promising, if he did so, to furnish him a horse and show him a crossing over the Rio Grande. At first, the defendant denied that he had any knowledge of the killing, but presently asked: "How much do you fellows want, anyhow?" Witness replied: "You ought to have got at least two hundred and fifty or three hundred dollars." Gildea said: "We want all you have got." Defendant said: "If you will do that (get him a horse and show him a crossing) it will be about one hundred and fifty dollars apiece in your pockets." Gildea said that he would go off and see about a saddle. Witness then asked defendant why he had killed Backus, and he replied: "I killed him for his money."

When Gildea came back, he took the defendant and went down toward the river, telling witness to get the horse and bring him on, and whistle when a certain point was reached. Witness did not get a horse, but waited a while, and then went to the place indicated and whistled. Gildea and defendant joined the witness, and defendant said: "Come on; I will show you where the money is hid." He then led witness and Gildea to a place where a water road had been blasted out of the rock, and, pointing up the bluff, said: "It is there." Defendant, witness and Gildea climbed up, and Gildea told defendant to point out where the money was hidden. The defendant, pointing, said: "There between those two rocks." Witness inserted his hand into a crevice made by a blast, over which a rock had been placed, and found the money. Gildea and witness took the money and placed the shackles back on the defendant's hands. The money found amounted to two hundred and eighty dollars,

ten of which the defendant said belonged to him, and the balance to Backus.

The defendant told the witness that he shot and killed Backus; that Backus fell at the first shot, and that he then shot him again; that he then struck him with two rocks, once in the mouth and once on the side of the head; that he then dragged the body to the bluff, rifled the pockets of the money, and threw the body over the bluff. After witness and Gildea had secured the money and reshackled the defendant, he said that he would not go back, and told witness and Gildea to shoot him, closing with the remark: "You fellows think you have played a d——d smart trick." Next day the witness went to the point where the defendant said he killed the deceased, and there found a plain trail, showing where some heavy body had been dragged along. There was blood on the stones and grass, and two rocks, one of them bloody. Everything was found just as described by the defendant.

Cross-examined, the witness stated that, in the conversation with witness and Gildea, the defendant said that he and Backus went to Gulet's camp to buy a pair of shoes; that, on their return, he told Backus that he, Backus, owed him fifty cents; that Backus told him that he was a d——d liar; that he then struck the deceased, and the deceased threw a rock at him; that they then clinched, and in the struggle he shot the deceased, and the deceased fell, when he shot him again; that, finding he had killed the deceased, and wanting no one to know it, he dragged the body to the bluff and threw it over; that he knew the deceased had money, and, thinking he might as well have it, he took it before throwing the body over. He did not tell the witness that he lost his pistol in the struggle, and, in looking for it, found the money on the ground over which he had dragged the body. The defendant was under arrest when he made the statements detailed, and had been promised protection from the mob, a horse, and information as to a crossing over the river.

On re-direct examination, the witness stated that it was about one o'clock at night when the defendant disclosed the place where the money was hidden. Gildea had, professedly, gone to see about getting a saddle when defendant told witness that he killed deceased for his money. Defendant and deceased were young men of about the same age.

A. M. Gildea was the next witness sworn for the State. He ·testified that he arrested the defendant in Crockett county,

Texas, on the first day of April, 1882. When witness told the defendant he was a prisoner, the defendant asked why he was arrested. Witness told him on suspicion of having murdered Backus. The defendant, at that time, had one of his fingers wrapped in rags. Witness made him unwrap it, and saw that it had been badly bitten. Witness then took him over to Slater's saloon, and witness and Slater concocted a scheme to extort a confession. They told the defendant that if he would tell about it, and show where he had secreted the money he took from the deceased, they would protect him from mob violence. The defendant at first refused the proposition, but, later, said that he would do so if witness and Slater would provide him with a horse, saddle and bridle, and show him a crossing over the Rio Grande. To this proposition witness and Slater agreed. Defendant then asked how much of the money witness and Slater wanted. Witness told him that they must have it all. Thereupon defendant refused to treat. About this time, a crowd of armed men began to collect around the saloon, and witness and Slater took the defendant to a brushy hollow near the saloon, and repeated their proposition. The defendant again asked how much of the money must be forthcoming, and witness told him again that all must be turned over. Defendant then said that he would not show where the money was hidden until he saw the horse, saddle and bridle, and had been shown the crossing. The witness then left him in charge of Slater, on the pretense of seeing about the saddle.

After a time, the witness returned and told defendant and Slater that he would take defendant to the river, while Slater would take a certain horse to that point. Slater left, as if to go for the horse. On their way to the river, the defendant stopped and said: "Let me get a heavy shirt I have here." He then stepped aside, to a small clump of bushes, stooped down and took up a shirt, which he threw over his arm. Witness and defendant went on to the "bottom." While waiting for Slater, witness struck a match, to light a cigarette, and, from the light of the match, noticed that the shirt had blood on it. Witness asked him where the blood came from. He said that some of it came from Backus's body, and some from his finger, which bled freely. When Slater whistled, witness and defendant went to where he was, and from there, under the guidance of the defendant, went to where the money was hidden. Defendant pointed to a crevice in the rock, and said: "There is the place."

Witness told him to point it out. He pointed down to the crevice, and said: "There; right there." Slater displaced a rock and found the money. Witness put the money in his handkerchief, and then in his pocket. The witness then turned to put the shackles on defendant. Defendant made a spring toward the bluff, but witness caught him. Defendant then began to cry; said that he would not go back to the saloon, and told witness to kill him. Witness replied that he was an officer,. performing his duty, and could not kill him. Defendant then said: "You fellows think you have played a h—ll of a smart. trick," and returned with the witness. During the conversation with witness and Slater, the defendant said that he killed Alexander Backus, dragged his body to the bluff, took the money out of Backus's pocket, and threw the body over the bluff. When this arrest was made, the witness was deputy sheriff of Tom Green county. He removed the defendant from Slater's saloon because he thought that a body of armed men were gathering to hang him.

Cross-examined, the witness stated that the murder was committed on Thursday evening, and that the defendant had ample time to make good his escape before his arrest on Saturday evening. The confession of the defendant as detailed was the result of an inducement held out to him by the witness—the same as stated on the examination in chief. Defendant made the statement concerning the killing, detailed by the witness. Slater on cross-examination, in the hearing of the witness. The money described was recovered by means of the information furnished by the defendant.

The motion for new trial presented the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

Willson, Judge. It is alleged in the indictment and the proof shows that the homicide of which defendant stands convicted was committed in Crockett county, about the thirtieth day of March, 1882. This conviction was had upon an indictment presented by the grand jury of Kinney county, and the trial took place in said Kinney county, the indictment alleging that Crockett county, the venue of the offense, was attached for

judicial purposes to said Kinney county. Defendant excepted to the indictment upon the following grounds:

1.   Because it did not appear to be the act of the grand jury of the proper county.

2.   Because at the time of the alleged offense Crockett county was attached for judicial purposes to Tom Green county, and that the grand jury of Kinney county had no jurisdiction over the offense.

3.   Because the indictment does not show the venue of the offense to be within the jurisdiction of the district court of Kinney county.

4.   Because it does not appear that the grand jury who presented the indictment were impaneled to inquire into and of offenses in said county; and

5.   Because it does not appear from said indictment that said Crockett county is not duly organized.

These exceptions were overruled by the court, and this ruling is assigned as error.

1.   By act of twenty-second of January, 1875, Crockett county was created out of a portion of the territory of Bexar county. (Acts Fourteenth Legislature, second session, p. 2.) By act of February 10, 1875, it was attached to the county of Kinney for judicial purposes. There was no further legislation in regard to Crockett county until the adoption of the Revised Statutes. In apportioning the counties into judicial districts, Crockett county, by the Revised Statutes, is placed in the twentieth district, but it is not attached for judicial purposes to any county. (Rev. Stat., Art. 17, subdiv. 20.) It was placed in the seventy-fifth representative district (Rev. Stat., Art. 13, subdiv. 75), and in the thirtieth senatorial district (Rev. Stat., Art. 11, subdiv. 30), but was not placed in any congressional district. (Rev. Stat., Art. 16.) By act of April 28, 1882, it was again attached for judicial purposes to Kinney county (Acts Seventeenth Legislature, special session, p. 5), and it was again so attached by act of April 9, 1883. (Acts Eighteenth Legislature, p. 65, sec. 38.) It does not appear to have ever been attached for judicial purposes to any county except Kinney, nor does it appear to have been organized at any time, but on the contrary is treated by the act of April 9, 1883, above referred to, as an unorganized county at that date.

Did the Revised Statutes repeal the act of February 10, 1875, attaching Crockett to Kinney county for judicial purposes? We

think so. Section 3 of the final title of the Revised Statutes provides "that all civil statutes of a general nature in force when the Revised Statutes take effect, and which are not included herein, or which are not hereby expressly continued in force, are hereby repealed." The act of February 10, 1875, above referred to, was a civil statute of a general nature, and therefore repealed. (*Cox* v. *The State*, 8 Texas Ct. App., 254.) This being the case, Crockett county was no longer attached to Kinney county for judicial purposes.

What county, then, had jurisdiction over it for judicial purposes? In our opinion Bexar county, the county from whose territory it was created, resumed jurisdiction over it for judicial purposes. (*Runge* v. *Wyatt*, 25 Texas Supp., 291; *Clark* v. *Goss*, 12 Texas, 395; *O'Shea* v. *Twohig*, 9 Texas, 336; *Nelson* v. *The State*, 1 Texas Ct. App., 41.) This jurisdiction remained with the mother county, Bexar, until April 28, 1882, when it was again detached and given to Kinney county, by the act of the Legislature of that date. (Acts Seventeenth Legislature, special session, p. 5.) On the nineteenth day of September, 1882, the indictment in this case was presented and filed in the district court of Kinney county. At that date said district court had jurisdiction over the county of Crockett, but did not have such jurisdiction on the thirtieth day of March, 1882, the date of the commission of the homicide. At that date Bexar county had jurisdiction over said Crockett county.

But, it not appearing that Bexar county ever exercised or attempted to exercise its jurisdiction over this case, did not the jurisdiction of Kinney county attach to the case when Crockett county was attached to it for judicial purposes by the act of April 28, 1882? We think so. It is well settled that when the place where an offense is committed is, after the commission of the offense, created into a new county, such new county has jurisdiction over the offense. (*Republic* v. *Smith*, Dallam, 407; *Nelson* v. *The State*, 1 Texas Ct. App., 41.) We think this rule is applicable to the case before us. Crockett county, had it been organized, would of course have had jurisdiction over this offense, but until it was organized that jurisdiction was vested in Kinney county, but the jurisdiction was nevertheless that of Crockett county, transferred for the time being to Kinney county for the purposes of justice and the due enforcement of the laws.

We hold, therefore, that the district court of Kinney county

did not err in entertaining jurisdiction of this case, and that none of the defendant's exceptions to the indictment are well taken.

2. Upon the trial, the confession of the defendant that he had committed the murder was admitted in evidence over his objections, and this ruling of the court was objected to, and is properly presented in the record by bill of exceptions. At the time of making the confession the defendant was in the custody of an officer, having been arrested by said officer for said murder. He was told by the officer and another person who was assisting the officer as a guard, that they knew that he, defendant, had killed the deceased, and that the best thing he could do was to tell them the whole thing, and tell them what he had done with deceased's money; that if he would do this they would protect him from being mobbed, and would furnish him with a horse, and show him a crossing on the Rio Grande into Mexico. Thereupon the defendant confessed he had killed the deceased for his money, and he detailed the manner of the killing; stating that he shot him in the head with a pistol, and hit him on the head with rocks, and then dragged the dead body to a bluff on the river bank and threw it over the bluff; that he killed deceased to get his money, and told where the money was concealed in a crevice among the rocks, and pointed out the place. The money was found at the place pointed out by him, and it was also found upon examination of the ground where he said the murder was perpetrated that a body had apparently been dragged from there to the edge of the bluff, beneath which the dead body of deceased had previously been found. On the ground where defendant stated he killed deceased was also found two rocks with blood upon them. All these statements were made while the defendant was under arrest, and without his being cautioned that they would be used in evidence against him, and upon the promise that he would be protected from the mob and would be assisted across the Rio Grande into Mexico, and these assurances and promises were made to him by the officer having him in custody.

Were the confessions of the defendant, made under the circumstances stated, admissible in evidence against him? At common law, as we understand the authorities, a confession induced by promises or threats, of a character and under circumstances such as might have influenced the mind of the prisoner in making the confession, would not be evidence against him

under any circumstances. (1 Greenl. Ev., secs. 219–231, 232; Whart. Crim. Ev.,-secs. 650, 651, 678.) But, while this is the general rule prescribed by the provisions of our statute relating to confessions, we think that statute makes an exception not recognized fully by the common law. Where, in connection with the confession, the prisoner makes a statement of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or instrument with which he states the offense was committed, then, in our opinion, his entire confession, as well as his statements as to such extraneous facts, are admissible evidence against him.

There is some confusion and conflict in the decisions of our courts upon this point. In *Warren* v. *The State*, 29 Texas, 370, the defendant was induced by fear that his life would be taken to make a confession, in connection with which he made statements conducive of his guilt, and which were found to be true. He also at the same time made other statements which had no bearing upon the issue of his guilt. His confession and the accompanying statements were admitted in evidence, and the court charged that "if some of the facts confessed were found to be true by other evidence, the jury may consider them all true." This charge was held error because it did not confine the jury to the consideration of those facts and circumstances found to be true, which conduced to establish the guilt of the defendant, but permitted them to consider other facts in evidence which did not conduce to establish his guilt; and for this error in the charge the conviction was set aside. Judge Donley, in delivering the opinion of the court, after stating the common law rule which rejects a confession when made under the influence of a threat or promise, says that our statute regulates the subject now, and he recognizes the exception to the general rule which we have hereinbefore stated, and holds, as we understand the opinion, that not only the statements of the prisoner which were in corroboration of his confession and conducive to establish his guilt were evidence against him, but that his entire confession of guilt was also evidence, although extorted by fear. *Selvidge* v. *The State*, 30 Texas, 60, in which the opinion was delivered by the same learned judge, supports, we think, the view expressed in the Warren case.

In *Strait* v. *The State*, 43 Texas, 486, the same question occurred, but was not decided, as a disposition of the case was

made upon other grounds.   Chief Justice Roberts, in delivering the opinion in Strait's case, cites the Warren and Selvidge cases and says:   "We understand these cases merely as holding that it is admissible to show not only the fact that the stolen property had been traced by means of information received from the prisoner, but also the information or disclosure itself."

In *Walker* v. *The State*, 2 Texas Court of Appeals, 326, Presiding Judge Ector, in delivering the opinion of the court, plainly and emphatically states the difference between the rule at common law and the rule as prescribed by our statute.   After stating the rule at common law, he says:   "In this State, when a prisoner makes a statement of facts, and, in consequence of such information, the property stolen, the bloody clothes of the deceased, or the instrument with which he says the offense was committed, or any other material fact is *discovered,* such statement, *together with the confession of the crime itself,* is proper testimony to go to the jury."   In *Davis* v. *The State,* 2 Texas Court of Appeals, 588, after quoting the common law rules relating to confessions, it is said:   "These common law rules have been modified by our Code in some important respects," and, as one of the modifications, the one we are discussing is named.

In *Davis* v. *The State,* 8 Texas Court of Appeals, 510, the rule, as stated in the previous decisions above cited, seems to be restricted, or, rather, not recognized, and the common law rule, as stated by Mr. Greenleaf (1 Greenl. Ev., sec. 231), is quoted and approved.   This rule, as we have before seen, while it admits in evidence the statements of the prisoner as to extraneous material facts found to be true, excludes the confession of guilt, unless it is otherwise admissible.   In *Walker* v. *The State,* 9 Texas Court of Appeals, 38, it is said: "When a confession is made by a prisoner in custody, without his having been first cautioned that it may be used against him, and, in connection with such confession, he states facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, his statement of the facts or circumstances which are found to be true is competent evidence, *but not the entire confession.*   This is the settled construction of our statute regulating the admissibility of confessions."   The cases referred to as thus settling the construction of the statute are as follows:   *Davis* v. *The State,* 8 Texas Court of Appeals, 510; *Strait* v. *The State,* 43 Texas, 486; *Selvidge* v. *The State,* 30

Texas, 59, and *Warren* v. *The State*, 29 Texas, 370, all of which we have hereinbefore referred to.

Upon a careful examination, we do not think the rule as stated in the Walker case, last quoted from, is supported by any of the decisions cited except the Davis case. It is also to be noted that Walker's case, in 2 Texas Court of Appeals, and Davis's case, in 2 Texas Court of Appeals, *supra*, which hold a contrary doctrine, are not referred to. In *O'Connel* v. *The State*, 10 Texas Court of Appeals, 567, it is said that "the rule will not admit the entire confession, but is limited solely and strictly to the facts and circumstances found to be true. To go beyond, and admit the entire confession, would be contrary to the settled construction of our statutes regulating confessions," citing *Davis* v. *The State*, 8 Texas Court of Appeals, 510, and *Walker* v. *The State*, 9 Texas Court of Appeals, 38. In *Massey* v. *The State*, 10 Texas Court of Appeals, 645, the same rule is declared, upon the same authority. So, also, in *Kennon* v. *The State*, 11 Texas Court of Appeals, 356.

We have, we believe, referred to all the decisions bearing upon the question under consideration, and, as we understand them, there is a conflict between them, the earlier cases holding that our statute modifies the common law rule, and the later cases not recognizing such modification, but stating the rule precisely as stated at common law.

After much reflection upon the subject, we have concluded that the correct rule, under our statute, is the one declared in *Walker* v. *The State*, 2 Texas Court of Appeals, 326, and which we have hereinbefore stated and quoted. We think the recent decisions upon this question, commencing with *Davis* v. *The State*, 8 Texas Court of Appeals, 510, were the result of a misapprehension of the former decisions of our Supreme Court, and a failure to recognize the modification which we now think the statute has engrafted upon the common law rule. Such being our views, we now overrule all decisions which are contrary to the rule now declared to be the correct one.

In the case before us, the confessions of the defendant, though made under the influence of promises such as would render the same inadmissible in evidence, were corroborated by accompanying statements made by the defendant of extraneous facts conducing to establish his guilt, and found to be true, and were therefore brought fully within the provisions of our statute, and made competent evidence against the defendant. We hold that

the court did not err in admitting the whole of the confession and statement of the defendant.

We find no error in the conviction, and it is affirmed.

_Affirmed._

Opinion delivered May 17, 1884.